<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                          :

IN RE:                                     :          CHAPTER 11

                                           :

 STACY ALLEN,                        :          CASE NO.  13-14348(GMB)

                                           :

                     Debtor.       :

_____:    <u>MEMORANDUM OPINION</u>

<u>APPEARANCES</u>

                    Thomas D. Bielli, Esq.
                    David M. Klauder, Esq.
                    Ryan M. Ernst, Esq.
                    Daniel P. Murray, Esq.
                    O'Kelly Ernst & Bielli, LLC
                    901 Market Street, Suite 1000
                    Wilmington, DE 19801
                    Attorney for Debtor

                    Frank A. Santini, Esq.
                    Jason H. Baruch, Esq.
                    Trenam Kemker
                    200 Central Avenue, Suite 1600
                    St. Petersburg, FL 33701
                    Attorney for Claimant

Currently before the Court is Debtor Stacy Allen's Objection to the Proof of Claim filed by Advanced Telecommunication Network, Inc. Based on the legal analysis herein, the Proof of Claim should be allowed in part.

## I.    Procedural History

On March 1, 2013, Stacy M. Allen (the "Debtor") filed the within petition seeking to reorganize her financial affairs pursuant to 11 U.S.C. § 1101 et seq. On March 15, 2013, the Debtor filed her schedules and statements, listing total assets in the amount of $812,822.66, liabilities in the amount of $42,405.52, potential tax liabilities from the IRS and State of New Jersey Division of Taxation, and contingent, unliquidated and disputed claims of Advanced Telecommunication Network, Inc. (hereinafter "ATN") with an amount listed as "unknown."

After moving to withdraw the reference to the District Court, which was summarily denied on May 2, 2013, ATN filed a Motion for Relief from Stay before this Court and requested that said motion be heard on shortened time. Finding that ATN had failed to allege sufficient cause for a hearing on shortened time, the Court scheduled ATN's motion in the normal course. ATN then filed a Motion to Dismiss the Debtor's bankruptcy case, which closely resembled ATN's Motion for Relief from Stay, and both motions were heard on April 4, 2013 and denied on May 10, 2013.

On June 26, 2013, ATN filed a proof of claim against Stacy Allen in the amount of $4,300,000. In support of its claim, ATN attached a one-page explanation consisting of four bullet points.

- In 2010, the United States Bankruptcy Court for the Middle District of Florida avoided a transfer in the amount of $6 million from ATN to Debtor's husband, Daniel Allen. (Bankr. M.D. Fla. Case No. 6:03-ap-00122-KSJ.)
- On July 9, 2010, ATN filed a Verified Complaint in the United States Bankruptcy Court for the Middle District of Florida, Case Number 6:10-ap-00177-KSJ. (Doc. 1.) The Verified Complaint alleges various claims against the Debtor, including claims for subsequent transferee liability under Section 550 of the Bankruptcy Code.
-  Subsequent to the actions described in the Verified Complaint, ATN learned that the Debtor received over $2 million in transfers from an offshore trust in the Cook Islands over the span of approximately seven years. The funds constituting such transfers were derived from the funds at issue in the Verified Complaint reference

above, thus giving rise to subsequent transferee liability under Section 550 of the
Bankruptcy Code.

- Interest for the amounts described above began to accrue on or about June 1999 until
the date of judgment, according to applicable state and federal law.

(Claim 4-1 Basis for Claim Filed by ATN May 26, 2013). On July 22, 2013, the Debtor filed the
present Claim Objection. Among other things, the Claim Objection cited ATN's lack of support
for its claim. On October 9, 2013, ATN filed its Amended Brief in Opposition to Debtor's
Objection to Proof of Claim, which included within it a Renewed Motion for Relief from Stay
and Motion to Dismiss Case and a Motion to Extend Time to Conduct Discovery. On October
10, 2013, the Debtor filed her Brief in Support of Objection to Proof of Claim. The Court denied
the Motion to Extend Time to Conduct Discovery on October 15, 2013. On October 16, 2013,
ATN filed yet another Motion for Relief from Stay and Motion to Dismiss. However, it attached
no brief nor factual predicate, referring only to the October 9 embedded Motion. On October 24,
2013, the Court held a hearing on the Claim Objection wherein numerous exhibits in support of
ATN's claims were stipulated to by both parties and admitted by the Court. The Court took
under advisement Debtor's Claim Objection and ATN's Renewed Motion for Relief from Stay
and Motion to Dismiss, noting the improper procedure and lack of basis as to the latter. On
November 22, 2013, Debtor filed a response to both. This Court denied both the Motion to
Dismiss and the Motion for Stay Relief on December 17, 2013, and took the Debtor's Objection
to ATN's Proof of Claim under advisement.

Litigation between ATN and Debtor's husband, Daniel Allen, has been ongoing since at
least 2003 and relates to events occurring in the 1990's. Daniel Allen received approximately $6
million in settlement proceeds from ATN in or around 1999 after several years of state court
litigation.  ATN subsequently filed for Chapter 11 bankruptcy relief in the Middle District of
Florida.  Immediately thereafter, ATN filed an adversary complaint against Daniel and his
brother David Allen who also received his own settlement, alleging, inter alia, claims of actual
fraud, constructive fraud and unjust enrichment as a result of the 1999 settlement transfer.

Originally upon receipt of the transfer in 1999, David and Daniel Allen consulted with an
estate-planning professional who suggested the creation of trust vehicles for retirement planning
purposes.  Daniel Allen's trust vehicle was created and concededly funded largely by the
settlement funds. Between August 28, 2003 and October 2, 2003, after being served with an

3

adversary complaint in ATN's bankruptcy, Daniel Allen liquidated accounts inside the United States and is alleged to have wired at least $1.9 million to an offshore trust account in the Cook Islands: the Shingle Oak Family Trust.

A Florida Court entered an order directing the Allen Brothers to repatriate/return the monies to the United States in December of 2003. They failed to comply with the order, for reasons each party disputes, resulting in a holding by Judge Briskman on September 4, 2004 that both Daniel and David Allen were in contempt of court for failing to return the monies to the United States (collectively, the "Repatriation Orders"). It was at this time in 2004 that Daniel Allen complied with the request for an Accounting and it is included as ATN Exhibit 12.

On February 18, 2005, the Florida Bankruptcy Court ruled in favor of the Allen Brothers, dismissing the adversary complaint against them. All prior repatriation orders were thereafter vacated, consistent with the ruling at that time.  ATN then appealed the final judgment and finally on September 25, 2007, the Eleventh Circuit Court of Appeals reversed and remanded the ATN Litigation for further proceedings consistent with the appellate ruling.  On July 10, 2009, the Florida Bankruptcy Court, applying the Circuit's holding, entered judgment in favor of ATN, finding that a constructively fraudulent transfer did occur. The judgment was later reduced to $6 million.  More motions and appeals followed, culminating in the Eleventh Circuit affirming on June 8, 2011 that the Allens had waived their right to further appeals and reaffirming the final judgment in favor of ATN.

ATN then began its collection efforts with supplementary proceedings pursuant to Bankruptcy Rule 7069(a)(1).  As the Florida Bankruptcy Court noted in the July 28, 2011 Order, "[a]s a judgment creditor, ATN want[ed] to proceed with discovery in aid of execution on its final judgment...."  In re Advanced Telecomm. Network, Inc., 6:03-BK-00299-KSJ, 2011 WL 3585827, at *n. 24 (Bankr. M.D. Fla. July 28, 2011). To that end, ATN made a motion to have the 2004 repatriation orders reinstated and to vacate the 2005 order vacating the 2004 repatriation orders.  Refusing to grant such relief, the Florida Bankruptcy Court entered an order and attendant opinion which incorporated certain findings of fact and conclusions of law from the 2004 repatriation orders, but which specifically denied a blanket reinstatement of said orders (the "July 2011 Order").  As Judge Jennemann pointed out in the July 2011 Order, "the [2004]

4

[r]epatriation [o]rders were properly vacated because, at that time, the Allens had won their case…I lack the ability to reinstitute an order whose effectiveness has lapsed." Id. at *4.

In 2010, ATN also brought an adversary case in the Middle District of Florida against several defendants, including the Debtor. This adversary was then ordered abated by the Florida Court in July of 2010 pending conclusion of all appeals related to the Settlement Agreement. (ATN Ex. 10, p. 2) The adversary case sat dormant until February 8, 2013 when ATN filed an emergency motion to reopen the case, for an ex parte restraining order, and to seal the aforementioned filings.  Case No. 6:10-ap00177, Doc. No. 7-9 (Bankr.M.D.Fla, 7/9/2010).  An order was entered on February 21, 2013 reopening the adversary and granting ATN's emergency ex parte motion for temporary restraining order ("TRO") as to Stacy Allen. The TRO was ordered to expire fourteen days after the entry of the order and prohibited Debtor from, among other things, transferring or disposing of any property directly or indirectly traced to that received from ATN.  The parties were scheduled to appear again on March 4, 2013 for the Court to consider extension of the TRO. (Id.) On March 1, 2013, prior to that hearing, Stacy Allen filed her Chapter 11 petition in this Court.

## II.    Tracing the ATN Settlement Monies

Because of the evidence proffered by ATN, the Court is able to trace the monies received by Daniel Allen. First, the Accounting created by Daniel Allen in 2004 states that on June 8, 1999, a $4,590,200 payment "from the Carpenter/ATN settlement" was wired "directly from Flaster Greenberg into Daniel and Stacy Allen's Joint First Union Cap account."  (ATN Ex. 12, p. 3.) This account held, according to the Daniel Allen's Accounting, "other funds they had previously and subsequently accumulated in that account from other businesses . . . and Stacy Allen's employment and that belonged to them from their marriage." (Id.) After approximately $100,000 was put towards shares of a telecommunications firm, all of the remaining settlement money was wired to a joint American Express Financial Advisors Account on June 28, 1999. According to Daniel Allen, this account also again contained "significant non-Carpenter/ATN settlement monies." (ATN Ex. 12 Daniel Allen Accounting, p. 2.)

Despite her name being on the account, none of the proffered evidence demonstrated that the Debtor withdrew money from these accounts. In fact, in her Deposition, Debtor testified

repeatedly that she did not know where her husband actually deposited the money from the ATN settlement. (ATN Ex. 16, Stacy Allen Deposition April 12, 2013, p. 41, 50.) Furthermore, even though the accounting states that the account contained her salary, Stacy Allen testified to the fact that she was primarily a homemaker for the period in question. (Id.)

Daniel and Stacy Allen, as settlors, then established the Shingle Oak Family Trust with Southpac Trust Limited, located in the Cook Islands, serving as Trustee. The Shingle Oak Family Trust Agreement was signed by Debtor and Daniel Allen on September 2, 1999. Under the Trust Agreement:

> Trustee may pay to, appropriate or apply for the benefit of one, more or all members of the Appointed Class so much of the net income and/or capital of the Trust fund as the Trustee in exercise of sole and absolute discretion may think fit for their maintenance, support, education, comfort, well-being, pleasure, desire or happiness.

(ATN Ex. 17, at 6.)  According to the Trust Agreement, the property of the trust included: (1)Settlor-husband's right, title and interest as limited partner in and to Shingle Oak Family Partners, L.P., (2)Debtor's right, title and interest as limited partner in and to Shingle Oak Family Partners, L.P., and (3)Debtor's interest in 7 Shingle Oak Drive, Voorhees, New Jersey. (ATN Ex. 18 Trust Agreement Schedule 2.) The only beneficiaries of the trust were Debtor herself, her husband, Daniel Allen and the couples' three children. (ATN Ex. 17 Trust Agreement Schedule 3.) On the same day, Daniel Allen established Shingle Oak Family Partners, L.P., a Colorado limited partnership, naming  himself as 1% General Partner and Shingle Oak Family Trust as 99% Limited Partner.

On October 4, 1999, Daniel Allen's 2004 Accounting outlines that the American Express Financial Advisors Account, containing approximately $4,684,700, was "retitled in the name of" Shingle Oak Family Partners, L.P. (ATN Ex. 12 Daniel Allen Accounting,  p. 4.) As Daniel Allen retained control of the remaining funds in the joint American Express account to pay taxes, the Court will assume this means that the $4,684,700 held in the joint American Express Account was transferred to another American Express account in the name of Shingle Oak Family Partners, L.P. Daniel Allen, as general partner of Shingle Oak Family Partners, L.P. also remained the signatory on the new account. Approximately $1.5M, which remained in the Debtor and Daniel Allen's joint American Express account, subsequently used to pay taxes.

The Court understands that at this point, the Shingle Oak Family Trust, with Southpac acting as Trustee, held as its assets, its 99% ownership in the Shingle Oak Family Partners, L.P., and Daniel Allen's 1% interest in the Shingle Oak Family Partners L.P. Since the Shingle Oak Family Partners L.P. primarily held the $4,684,700 in its bank account, the Trust had full ownership of 100% of the remaining settlement proceeds, although Daniel Allen remained in control of the funds in the partnership's bank account.

In November of 2000, Daniel Allen, as General Partner of the Shingle Oak Family Partners, L.P., opened another account at Fleet Bank using unspecified funds from the Partnership's American Express Financial Account. Several payments were made by Daniel Allen from this account in 2000 amounting to $533,905 in addition to the payment of $149,169 in taxes.  In August of 2003, the evidence proffered demonstrates that Southpac, as Limited Partner of Shingle Oak Family Partners, L.P. instructed him in his capacity as general partner, to move the Limited Partnership's funds from the Partnership's American Express Financial Advisors Account and Fleet Bank Account to Southpac's bank account in the Cook Islands with Capital Security Bank.

On August 26-27, 2003, Daniel Allen, as General Partner of Shingle Oak Family Partners, L.P., heeded the instructions of the Shingle Oak Family Trust, as majority owner of the partnership, and liquidated the partnership. Thereafter, on September 8, 2003, he transferred approximately $1,991,536 from the Shingle Oak L.P.'s American Express Financial Account ($391,536.18) and Fleet Bank account ($1,600,000), namely all of Shingle Oak Family Partners' assets, to at Capital Security Bank in the Cook Islands. This is reflected by the Southpac Group , Capital Security Bank Trust Account Statement, which shows an opening balance of $1,991,381 as of September 30, 2003. (ATN Ex. 19.)  A further deposit was made November 19, 2003 in the amount of $6,694.61.  Shortly thereafter, ATN moved to repatriate the monies.

From that point on, the documents indicate that there were no further deposits made, but many transfers out of Southpac's Trust Account in the Cook Islands. (ATN Ex. 19.) The majority were via transfer to Debtor personally for cash over the course of July 2004 to June 2011 amounting to approximately $2,505,000.[1] In addition, payments to third parties such as attorneys

---

[1] Interest on the original approximately $1.9M amounted to approximately $605k.

or taxing authorities were initiated by Debtor. Her withdrawals are outlined via spreadsheet compiled by ATN. (ATN Ex. 23.) Debtor admits to later knowing that the money resided in a trust in the Cook Islands, which she could access, and in fact withdrew from, on multiple occasions. (ATN Ex. 16, Stacy Allen Deposition April 12, 2013, p. 54; ATN Ex. 19) The monies were then deposited into her bank account, or used to pay third parties for items such as tax obligations. (ATN Ex. 16, Stacy Allen Deposition April 12, 2013, p. 63.) All requests for disbursement from the trust were made in writing, and were normally approved. The Debtor recalls being declined once. (Id. at p. 58-61.) Debtor would write an email informing the trustee of the purpose for the withdrawal and would include wiring instructions if the money were going to a third party. She did not need her husband's permission to make requests. After she sent the email she would receive one indicating whether or not the request was approved. (ATN Ex. 20). The transfers would go into her personal checking account or be wired to the entity receiving the money.

In addition to the withdrawals from the Trust Account, Debtor supported herself with indeterminate income from small businesses and a part time data entry job where she earned less than $50,000 a year. (ATN Ex. 16, Stacy Allen Deposition April 12, 2012,  p. 6-12). None of this income was deposited into the Trust Account, as there were no deposits into the Trust account after August 12, 2004. The Trust was terminated in 2011 when the funds were completely depleted.

### III.    Jurisdiction

A proof of claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). After an objection is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount. 11 U.S.C. § 502(b) (2005).

Rule 3001 of the Federal Rules of Bankruptcy Procedure governs proofs of claims. In In re Wells, 463 B.R. 320, 326 (Bankr. E.D. Pa. 2011), the court summarized the effect of Rule 3001(f) as follows:

> [I]f a proof of claim complies with the Rules of Court and is self-sustaining (i.e., it sets forth the facts necessary to state a claim and is not self-contradictory), it is prima facie valid and the objecting party has the burden of producing evidence to refute the claim.

That evidence, if believed, must refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector meets that burden of production, the claimant must produce evidence to prove the validity of the claim, because the ultimate burden of persuasion is always on the claimant.

Id. (internal citations omitted).

## IV.   Parties' Arguments

Although not outlined in its original proof of claim, ATN submits two alternate theories of liability against the Debtor in support of its proof of claim. First, that ATN alleges that Debtor is liable as an immediate or mediate transferee for $4,684,700 plus pre-judgment interest arising from Debtor's receipt of the ATN Settlement transfer to Daniel Allen that the Florida Bankruptcy Court found to be a fraudulent transfer.  In the alternative, ATN argues that because Debtor received over $2,505,000 in transfers from the Shingle Oak Family Trust, and the trust contained the funds at issue in the Verified Complaint,  subsequent transferee liability arose under 11 U.S.C. §550 of the Bankruptcy Code.  Furthermore, that ATN is entitled to prejudgment interest on its proof of claim pursuant to In re Hechinger, 489 F.3d 568 (3d Cir. 2007) which allows for collection prejudgment interest at the discretion of the Court; which "should be awarded unless there is a sound reason not to do so."

In response to ATN's claim based on subsequent transferee liability, Debtor Defendant Argues first (1) that ATN bears the burden of tracing the funds it claims to be part of the fraudulent transfer to the Debtor has not sufficiently done so. Second, (2) that there is no benefit to the Estate from pursuing this litigation and instead the litigation pursued by ATN has cost the estate money. Lastly, (3) that the Debtor was a conduit of trust funds as the money she received from the trust went to living expenses for her family.

## V.   Discussion

For the reasons outlined below, the Court finds that ATN has a claim against Stacy Allen in the amount of $2,399,805.39 due to her liability as a subsequent transferee of the ATN settlement funds.  In order to adequately address its holding, the Court will first discuss the nature of all of the transfers after the initial transfer of the ATN settlement proceeds to Daniel Allen. Then the Court will address the impact of the trust and Debtor's beneficiary status of said

trust, on the nature of subsequent transferee liability. Lastly, the Opinion will consider the arguments raised by the Debtor to refute ATN's claim.

### A.  Section 550

ATN argues that under Section 550 of the bankruptcy code, Debtor is liable either for the entire $4,684,700 or in the alternative $2,406,500[2] as a subsequent transferee of the fraudulent transfer received by Daniel Allen, as determined by the Florida Bankruptcy Court under Section 544. Section 550 reads in relevant part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(1994).

When interpreting the term "transferee," the majority of courts apply the "dominion and control" test as explained in <u>Bonded Financial Services, Inc. v. European America Bank</u>, 838 F.2d 890, 893 (7th Cir. 1988); <u>see</u> <u>In re Rocco Co Inc.</u>, 10-18799,  2013 WL 1867909 at *8 (May 1, 2013) ("[T]he Third Circuit, like most others, has adopted the "dominion and control," or "conduit," test."). The test as stated by the Seventh Circuit indicates that, "the minimum requirement of status as 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." <u>See</u> <u>In re Blatstein</u>, 260 B.R. 698, 714 (E.D. Pa. 2001). The Court in <u>Bonded Financial Services</u> elaborated, holding that the term transferee "must mean something different from 'possessor', or 'holder' or 'agent.' To treat 'transferee' as 'anyone who touches the money' and then to escape the absurd results that follow is to introduce useless steps." <u>Bonded Financial Services</u>, 838 F.2d at 894 (finding that a bank who received a check for one of its account holders with the instruction to "deposit into account" was not an initial transferee, as it acted as a financial intermediary, received no benefit, nor had any dominion over the money).

---

[2] ATN updated its claim to credit the debtor $94,500 against the $2,505,000 in withdrawls as it inadvertently included funds in the amount of $94,500 that the Florida bankruptcy court did not include in its avoidance judgment.

Section 550(a) imposes liability on all recipients in a chain of transfers of fraudulently conveyed property. In re Whaley, 229 B.R. 767, 773 (Bankr. D. Minn. 1999) (citing In re Sherman, 67 F.3d 1348, 1356 (8th Cir.1995)).  To pursue a valid avoidance claim against a subsequent transferee requires a plaintiff to demonstrate that the initial transaction was avoidable, and that the initial transfer was later made to-or for- the benefit of the subsequent transferee. In re Mervyn's Holdings, LLC, 426 B.R. 96, 102 (Bankr. D. Del. 2010). There are certain defenses for subsequent transferees that do not exist for initial transferees.

> (b) The trustee may not recover under section (a)(2) of this section from—
>
> > (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> >
> > (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b)(1994).

In order to determine the validity of ATN's claim against the Debtor, this Court must first make a determination as to her transferee status. This includes first identifing all of the transfers made and identifying the respective parties as initial or subsequent transferees.

### B.  Transfers of the Settlement Funds

#### a.  Payment to Daniel Allen

It is uncontroverted that Daniel Allen is the initial transferee of the money. According to information presented on the settlement agreement, deposition and accounting of Daniel Allen, and prior court rulings regarding fraudulent transfer, Daniel Allen was the initial and only transferee of the settlement proceeds he received from ATN.

#### b.  Joint Account of Stacy and Daniel Allen

As set forth above, the documents and testimony establish that Daniel Allen deposited the settlement money into two joint accounts. First, the initial transfer was deposited into a First Union Cap account in the name of both the Debtor and Daniel Allen. He subsequently moved it to another joint account at American Express Financial Advisors.  Despite her name being listed on the accounts, the Court does not find that Stacy Allen became a transferee at this time.

The key to subsequent transferee liability is dominion and benefit.  Courts have relied on this focus in circumstances where "entity has legal title as a formal matter, but legally does not have any discretion in the application of funds." Rigby v. Mastro(In re Mastro), 465 B.R. 576, 612 (Bankr. W.D. Wash 2011)(finding that Debtor's wife was a subsequent transferee for money put into a corporate account because she was active in transferring funds to the account, used it to pay for personal expenditures of luxury items).

 Under New Jersey law, a joint account holder does not have dominion over the account by virtue of her name being on the account. The New Jersey Multiple-Party Deposit Account Act in relevant part provides:

> Unless a contrary intent is manifested by the terms of the contract, or the deposit agreement, or there is other clear and convincing evidence of a different intent at the time the account is created:
>
> a. A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit. In the absence of proof of net contributions, the account belongs in equal shares to all parties having present right of withdrawal.

N.J. Stat. Ann. § 17:16I-4 (2010)(alternatively "MPDA § 4"). In High v. Balun, 943 F.2d 323 (3d Cir. 1991), the Third Circuit Court of Appeals stated that MPDA § 4 was "intended to allow one party to deposit funds in a joint account without creating a presumption that the deposit, without more, made a gift to the other party." Id. at 326 (discussing the comment to § 6–103 of the Uniform Probate Code on which MPDA § 4 was based). The presumption of the statute can be overcome if it is established that the original depositor made an irrevocable inter vivos gift to the other party on the account. Lebitz-Freedman v. Lebitz, 353 N.J. Super 432, 438, 803 A.2d 156 (N.J. Super Ct. App.Div. 2002). ).  However, "a joint bank account, with right of survivorship… does not, by itself, constitute an inter vivos gift by the party depositing assets into the account to the other named party. Id. at 436, 158.

In order to determine if deposit into a joint account fits the requirements of a gift the Court must examine whether there was (1) donative intention, (2) delivery, and (3) relinquishment of dominion. Cziger v. Bernstein, 33 N.J. Super. 404, 407, 110 A.2d 560 (N.J. App. Div. 1954) (finding donative intent when the husband and wife were listed as joint accountholders, the husband showed the wife the passbooks and told her the money was in both

names, and further, the money in the account constituted proceeds derived from the sale of the tavern in which they both worked during their 21 year marriage). Clear and convincing evidence need be produced in order to overcome the statutory presumption. In re Purrazzella, 134 N.J. 228, 240, 633 A.2d 507 (N.J. 1993).

The deposit of the ATN Settlement funds into the party's joint account by Daniel Allen does not indicate there was donative intent to make a gift to the Debtor. There is no evidence that Daniel Allen intended the money to be a gift to his wife, or that he relinquished dominion over the funds. In addition, there was no delivery, as Daniel Allen was the only person shown to have acted upon the money in the joint account.  In fact, Debtor testified to not knowing where it was located, and ATN did not provide evidence to controvert this testimony. Additionally, there was no evidence that Debtor contributed to this account; further supported by her testimony that she was a homemaker during this period in time (ATN Ex. 16, Stacy Allen Deposition April 12, 2013, p. 5-12)

### c.  Shingle Oak Family Partners, L.P.

The settlement proceeds were next transferred to the Shingle Oak Family Partners, L.P. via Daniel Allen's transfer of the monies contained in the joint American Express Financial Advisors Account, to that of Shingle Oak Family Partners, L.P. This occurred on October 4, 1999 in conjunction with Daniel and Debtor's creation of the Shingle Oak Family Trust. At this point, the Court considers the money to have remained property of Daniel Allen. [3] The Shingle Oak Family Partners, L.P. was established under Colorado law. A limited partnership under Colorado law is described as:

> [A] partnership formed by two or more persons, having as its members one or more general partners who manage the business and are personally liable for partnership debts, and one or more limited partners who contribute capital and share profits but take no part in running the business and incur no liability beyond their capital contributions.

Winter Park Devil's Thumb Inv. Co. v. BMS P'ship, 926 P.2d 1253, 1255 (Colo. 1996)(citing § 7–61–102, 3A C.R.S. (1986); Evans v. Galardi, 16 Cal.3d 300, 128 Cal.Rptr. 25, 29, 546 P.2d

---

[3] The Court assumes that Debtor had no active role in the creation of the L.P. as she did not own an interest, nor were there documents presented that indicate she was active in the partnership.

313, 317 (1976)). Again, the definition of transferee is, "dominion over the money or other asset, the right to put the money to one's own purposes." <u>See</u> <u>In re Blatstein</u>, 260 B.R. 698, 714 (E.D. Pa. 2001).

As General Partner of the limited partnership, thereby allowed to manage the business, Daniel Allen continued to exercise "dominion" over the funds.[4] Similar to the wife in <u>In re Mastro,</u> he continued to hold all management authority notwithstanding the funds being placed into the partnership, as he retained the ability to direct the resources of the partnership.

### d.  Shingle Oak Family Trust

The Shingle Oak Family Trust took physical possession of the ATN settlement funds on August 26-27, 2003 when Daniel Allen, as General Partner of Shingle Oak Family Partners, L.P., liquidated the partnership. In doing so, Daniel Allen transferred all monies held in the Shingle Oak Family L.P. accounts to the Shingle Oak Family Trust Trustee's trust account held in Capital Security Bank, Ltd., in the Cook Islands, under the control of Southpac as Trustee.

Under the dominion test, a transferee is one who has dominion over the money or other assets and the right to put the money to one's own purpose. <u>Bonded Financial Serv., Inc. v. European American Bank</u>, 838 F.2d 890, 893 (7th Cir. 1988).  In other words, a "transferee must have the legal right to use the funds to whatever purpose he wishes, be it to invest in 'lottery tickets or uranium stocks.'" <u>In re Mervyn's Holdings, LLC</u>, 426 BR at 103 (<u>citing</u> <u>Bonded Financial, Inc.</u>, 838 F.2d at 894).

The District of Delaware found in <u>Mervyn's Holdings</u> that Bank of America, Trustee of a Trust compiled of funds collected as part of a bankruptcy sale, was a mere conduit, gaining no benefit from the transfer and bound under the terms of the Trust. <u>Id.</u> at 104. Therefore, as the

---

[4] ATN in a late submission to the Court attempts to argue that as the general partner in the L.P., Daniel Allen owed a fiduciary duty to his wife and therefore, they were in privity. This is not factually or legally correct. Looking to the documents submitted, Daniel Allen was a 1% general partner in the L.P. and Shingle Oak Family Trust was a 99% owner. Debtor was a beneficiary of the Trust. Thus, there is no way that Daniel Allen's fiduciary duty as general partner extended to her as a trust beneficiary. Where a "managing partner controls the partnership's business, that partner is held to the strictest possible obligation to his or her co-partner since the affairs of all partners are delegated to the manager without interference or monitoring on the part of the non-managing partners." <u>Heller v. Hartz Mountain Indus., Inc.</u>, 270 N.J. Super. 143, 150-51, 636 A.2d 599, 603 (Ch. Div. 1993).

As to ATN's remaining arguments on privity, the Court rejected these arguments in its previous opinion  dated May 10, 2013, entitled <u>In re Allen</u>, 13-14348 GMB, 2013 WL 1952338 (Bankr. D.N.J. May 10, 2013).

Trustee could not put the funds to its own purpose, it was no different from a courier or intermediary. Id. (compare In re Maui Indus. Loan & Finance Co., 477 B.R. 134, 46 order amended on denial of reconsideration, 483 B.R. 346  (Bankr. D. Haw. 2012) (finding a trust to be an initial transferee as it held legal title over assets brought into the trust by its trustee as it had nearly unlimited discretion over the assets).

Under the Trust agreement Article VI and Schedule VI, Southpac, as trustee of the Shingle Oak Family Trust had sizable discretion over all aspects of investment, sale, and distribution of trust assets. The trust agreement provided that the trustee had "all powers and authorities of investment, repair, management, sale, exchange, partition, mortgage, leasing, insurance, improvement. . . ." (ATN Ex. 17 Schedule VI.) However, in fact Southpac did not have unlimited discretion to use trust funds to its own purpose as it was set up to only make distributions to the settlors, "necessary for their maintenance and support," over the life of the trust (ATN Ex. 17, Article III).  Further, the documentation calls for the remaining balance of the Trust to be distributed to issue of the settlors at the death of settlor wife. (ATN Ex. 17, Article III p. 13.) Therefore, the Trust did not exercise complete dominion or control over the funds and is not a subsequent transferee.

### e.  Stacy Allen as Trust beneficiary

Unlike the prior deposit into Debtor and Daniel Allen's joint account, it is clear to the Court that Daniel Allen (on behalf of the Shingle Oak Family Partners L.P.) deposited the remaining settlement monies in the Southpac Cook Island Trust, with the intent to make a gift to his wife and children.

To pursue a valid avoidance claim against a subsequent transferee requires plaintiff to demonstrate that the initial transaction was avoidable, and that the initial transfer was later made to-or for the benefit of the subsequent transferee. In re Mervyn's Holdings, LLC, 426 B.R. 96 (2010). In finding trust beneficiaries subsequent transferees, the Bankruptcy Court of the District of Hawaii found that:

> The fraudulent transfer law is not meant to punish wrongdoers. Instead, the law recognizes that, when a person or company becomes insolvent, its creditors (most of whom are innocent victims, just like the Beneficiaries) should share the loss proportionally. If the debtor made transfers that benefitted some creditors at the expense

of others, the recipients (even if innocent) must return the property so the pain of the
insolvency is shared more equitably

In re Maui Indus. Loan & Fin. Co., 477 B.R. 134, 147 order amended on denial of
reconsideration, 483 B.R. 346 (Bankr. D. Haw. 2012).

In the present case, the Bankruptcy Court of the Middle District of Florida, following the
Eleventh Circuit's ruling, determined that the initial transfer of ATN settlement monies was a
fraudulent transfer.  This Court now finds that the final deposit into the Shingle Oak Family
Trust Account in the Cook Islands was a subsequent transfer made for the benefit of Debtor.

According to Debtor's deposition, only she and her husband were beneficiaries of the
trust and "anyone who was a beneficiary of the trust could request funds from the trust." (ATN
Ex .15) Regardless, it was only the Debtor who withdrew the money. She had nearly unchecked
freedom to withdraw funds from the Trust and in fact did withdraw the entire $2.5M from the
account over the last ten years.  The Trust records indicate that neither Daniel Allen nor anyone
else requested or received any distributions from the Trust Account.  Thus, Debtor had full
control of the money and put it to her own use, making her a subsequent transferee of the
fraudulent transfer at the time she was allocated trust distributions.

### f.  Pre-Judgment Interest

The primary goal of 11 U.S.C. §550 is equity and restoration, *i.e.,* "putting the estate back
where it would have been but for the transfer" Collier on Bankruptcy § 550.02[3][a] at 550–10;
11 U.S.C. § 550(e)(1)(A).  There is no reference to prejudgment interest in the Bankruptcy Code,
but courts have relied on the word "value" in §550(a) in allowing the award of interest. In re
Hechinger, 489 F.3d 568, 579 (3d Cir. 2007).  The debtor's estate would have been able to earn
interest on the funds in question if the preferential transfer had been in the possession of the
debtor's estate rather than the possession of the transferee. In re Nathan and Miriam Barnet
Memorial Hosp. Ass's, 07-02661, 2009 WL 3230789, at *11 (Bankr. D.N.J. October 5, 2009).
Thus, prejudgment interest is required to fully return the value of the transferred property to the
estate. Id. Furthermore, the Third Circuit mandates it "should be awarded unless there is a sound
reason not to do so." In re Hechinger, 489 F.3d at 580; In re 1031 Tax Group, LLC, 439 B.R. 84,
87-88 (Bankr. S.D. N.Y. 2010)(weighing several factors including the need to fully compensate

the wrong party, considerations of fairness and equity, the remedial purpose of the statute involved, and other relevant principals).[5]

The award of prejudgment interest is at the discretion of the Court.  Denial of prejudgment interest will be due to inequity or as otherwise inappropriate. Id.; See e.g.  In re Nathan and Miriam Barnet Memorial Hosp. Ass's, 07-02661, 2009 WL 3230789, at *11 (Bankr. D.N.J. October 5, 2009)(holding that general arguments of unfairness are not sufficient to deny interest); but cf. In re Bellanca Aircraft Corp., 850 F.2d 1275, 1281 (8th Cir. 1988) (affirming discretionary denial by the bankruptcy court of a request for prejudgment interest where a preference payment was not able to be determined without a judicial determination); In re Interstate Bakeries Corp., 499 B.R. 376 (Bankr. W.D. Mo. 2013) (denying prejudgment interest as inequitable because value of avoidable transfer was not clear prior to trial and because the trustee's tactical decisions delayed the adjudication).

The Court has considered the award of pre-judgment interest and rejects ATN's request. While only $1,991,381 was deposited in the Single Oak Family Trust Account, interest was generated, on the funds in the account over time, and is included in the amount that this Court determines is recoverable by ATN.  Awarding additional interest as a part of this judgment would be allowing for a double recovery by ATN. Thus, the Court finds Debtor liable for $2,399,805.39 as a subsequent transferee of the ATN settlement funds, which includes pre-judgment interest that accrued over the time period when the funds were in the trust account.[6]

### C.  Stacy Allen's Defenses:

### a.  Comingling of Assets

Debtor asserts several defenses to ATN's argument in her objection to claim and subsequent submissions. Debtor's first argument is that ATN has not traced the funds it seeks to recover from the Debtor, nor proven any specific amount to which it is entitled. "In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate." IBT International, Inc. v. Northern (In re International Administrative Serves., Inc., 408

---

[5] Although Hechinger was a preference case under 11 U.S.C. § 547, its holding has been applied to fraudulent transfers under § 544 or § 548.  In re David Cutler Indus., Ltd., 502 B.R. 58, 79 (Bankr. E.D. Pa. 2013).
[6] The Court does not include the last transfer of $6,694.61 into the trust account as ATN has not demonstrated from where that money was transferred or if it was part of the ATN settlement.

F.3d 689, 708 (11th Cir. 2005). The fact that funds are transferred multiple times does not prohibit the Court from tracing the funds to the ultimate transferee. In re Palisades at W. Paces Imaging Ctr., LLC, 501 B.R. 896, 917 (Bankr. N.D. Ga. 2013). "It is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified." In re Int'l Admin. Servs., 408 F.3d at 709 (citations omitted).

Under In re 1031 Tax Group, LLC, 439 B.R. 78 (Bankr. S.D.N.Y. 2010) the Southern District of New York held that comingling of funds in an account, those that were and were not fraudulently transferred, did not eliminate the right of a party to recover pro rata. Id. at 84. In that case, Trustee of a Ch. 11 case obtained a judgment related to transfer of certain funds into an escrow account containing funds derived from two sources. First, tainted funds transferred into the account via debtor and clean funds transferred via a third party loan. Id. at 82. The court determined the trustee could recover based on the percentage of tainted funds. Id. at 84. See also SEC v. Infinity Grp. Co., 226 Fed.Appx. 217, 218 (3d Cir. 2007)("[T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion approving such distributions").

ATN has offered evidence in the form of documentation stipulated to by the Debtor to meet its burden. First, ATN submits an Order by the Middle District of Florida showing the transfer to Daniel Allen was fraudulent. Via the accounting done by Daniel Allen, and the Trust Account records submitted to the Court, it is clear that the settlement monies were placed into a joint account of Debtor and Daniel Allen, they were transferred to property of the L.P., and then moved to the Trust's account in the Cook Islands. The excel spreadsheet outlines the amounts which the Debtor subsequently removed from the trust account over the years. Debtor stipulates to its accuracy.

Debtor questions the ability of ATN to prove its claim by asserting that she was the primary source of income for the family during the last several years and deposited that money into the trust account, money that constituted the collective savings of herself and her husband were in the account in question. The Court also finds this unpersuasive as in order to sustain a comingling defense, Debtor needed to show at least some evidence of other money in the accounts in question, or that she made deposits to the account. Evidence provided shows that, in

fact, that the Debtor was unemployed prior to the 1999 settlement and her wages were minimal after that point. Further, there is no evidence of these purported earnings were deposited into the trust account holding the remaining ATN settlement funds. In fact, there were no deposits into the trust account after 2004.

There were approximately $6 million dollars of settlement money, and approximately $1.9 million was transferred to the offshore trust account. Even if there were some other assets in any of the accounts along with way, the recovery by ATN in this regard is less than half of the amount that the Florida Court found was fraudulently transferred and those other monetary amounts were minimal. The funds can be traced to the Debtor and were utilized by her.

### b.  No benefit to the estate

Debtor next argues that recovery of the fraudulent transfer will be of no benefit to the estate. Debtor argues that the litigation, after ten years, has not resulted in any benefit to the estate, and that ATN has not demonstrated how it will do so now. The Court does not find this persuasive.

In In re Acequia, Inc., 34 F.3d 800, 812 (9th Cir. 1994), the Ninth Circuit allowed a fraudulent conveyance action to go forward even though unsecured creditors were already being paid in full, reasoning that recovery would secure debtor's post confirmation obligations under the reorganization plan, including continued payments to a secured creditor. The Ninth Circuit further found that recovery would reimburse the bankruptcy estate for the costs of pursuing fraudulent conveyance litigation against the defendant. Id. If funds are recovered by ATN, they may be utilized for administration or other creditors as the Florida Bankruptcy Court may determine.

### c.  Mere Conduit

Debtor's last defense was that she acted as a mere conduit that made transfers lawfully and in good faith. This is a flawed argument. Under the theory of conduit liability, "where a transferee is 'not under any contractual or other obligations to use [transferred funds] for the benefit of [third parties,]' but rather, may use the funds freely, it is not a 'mere conduit.' In re Lenox Healthcare, Inc., 343 B.R. 96 (Bankr. D. Del. 2006) citing Official Comm. Of Unsecured Creditors v. U.S. Relocation Servs., 338 B.R. 194, 202 (Bankr. S.D.N.Y. 2005).  To be a mere conduit, a defendant has to establish that it lacked dominion or control over the transfer, and that

it just passed through its hands and it had no power to redirect the funds to its own use. Id. See Richardson v. I.R.S., 277 B.R. 875, 880-81 (1st Cir. Bap 2002) (holding the defendant gained dominion and control upon delivery of a check payable to "cash" because the check became negotiable upon the defendant's receipt); In re Whaley, 229 B.R. 767, 773 (Bankr. D. Minn. 1999)(holding debtor and partner were initial transferees of monies deposited in their joint account, and the bank itself that held the account from which the checks were drawn upon, was a mere conduit).

As already elaborated upon above, the Debtor as beneficiary of a trust is liable as a subsequent transferee. The Debtor received money from the trust and used it in the manner she saw fit. She had substantial control over the use of the money and as such, there is no basis for her conduit theory.

### d.  Good faith

The fraudulent transfer law is not meant to punish wrongdoers. Instead, the law recognizes that, when a person or company becomes insolvent, its creditors (most of whom are innocent victims, just like the Beneficiaries) should share the loss proportionally. In re Maui Indus. Loan & Fin. Co., 477 B.R. 134, 147 order amended on denial of reconsideration, 483 B.R. 346 (Bankr. D. Haw. 2012).  Beneficiaries of a trust, as subsequent transferees, are entitled to the good faith defense under section 550(b), which protects such transferees that have taken for value, in good faith and without knowledge of the viability of the transfer. 11 U.S.C. § 550(b)(1). However, this requires that they actually gave value for the trust distribution. In re Maui Indus. Loan & Fin. Co., 477 B.R. at 146-47. It is well settled that "[i]ntangible, non-economic benefits, such as preservation of marriage, do not constitute reasonably equivalent value." Hinsley v. Boudloche (In re Hinsley), 201 F.3d 638, 643 (5th Cir.2000); Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.), 139 F.3d 574, 577 (7th Cir.1998); Dietz v. St. Edward's Catholic Church (In re Bargfrede), 117 F.3d 1078, 1080 (8th Cir.1997) (per curiam).

Stacy Allen argues that she never engaged in any wrongdoing and simply accepted distributions from the trust without any knowledge of the ongoing Florida court case. She further posits that she requested distributions merely to support her family, as allowed by the trust documentation.  It is irrelevant that she may be an innocent party. As the law recognizes that when a person or company becomes insolvent, its creditors should share the loss proportionally.

Further, even though Debtor supported her family, because there was no value given in return for access to the funds, the good faith defense under 11 U.S.C. 550(b)(2) is not applicable.

**VI.      CONCLUSION**

For the reasons set forth above, Court denies Debtor Stacy Allen's Objection to the Proof of Claim filed by Advanced Telecommunication Network, Inc. and determines that ATN possesses a claim in the amount of $2,399,805.39 against Debtor as a subsequent transferee of the ATN settlement funds.

BY THE COURT:

GLORIA M. BURNS
United States Bankruptcy Judge

Dated:  March 26, 2014